UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ALEXIS SCOTT, o/b/o S.R.,    )
    )
    Plaintiff,    )
    )
    v.    )    No. 4:9CV1807TIA
    )
MICHAEL ASTRUE, Commissioner    )
of Social Security,    )
    )
    Defendant.    )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

Claimant Alexis Scott filed an Application for Child's Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 86-95)[1] filed

by Alexis Scott on behalf of S.R. on October 18, 2004. Claimant states that her disability began

on August 25, 2004, her date of birth, as a result of spina bifida and low birth weight. (Tr. 28,

106). On initial consideration, the Social Security Administration denied Claimant's claims for

benefits. (Tr. 28-32). Claimant requested a hearing before an Administrative Law Judge

("ALJ"). (Tr. 33). On October 14, 2005, the Office of Hearings and Appeals scheduled a hearing

before the ALJ on November 28, 2005. (Tr. 34-38). Claimant returned the completed

Acknowledgment Form on November 23, 2005, indicating that she would be present for the

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 14/filed March 11, 2010).

hearing. (Tr. 41). On November 18, 2005, a hearing was held before an ALJ. (Tr. 386-96). Claimant testified and was not represented by counsel. (Id.). On April 7, 2006, the ALJ issued an unfavorable decision. (Tr. 14). In a letter dated June 10, 2006, Claimant requested the Appeals Council review the ALJ's unfavorable decision issued on April 12, 2006. (Tr. 43). The Appeals Council remanded the claim on April 20, 2007. (Tr. 14). On June 13, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 42). On September 27, 2007, a supplemental hearing was scheduled before the ALJ. (Tr. 51-55).

The ALJ forwarded a Notice of Hearing - Important Reminder reminding Claimant of the time and place of the requested hearing and noting how he had not received the Acknowledgment Form from Claimant. (Tr. 39). The ALJ enclosed another Acknowledgment Form and directed Claimant to complete and return the form immediately. (Tr. 39-40). The ALJ apprised Claimant that if she failed to appear at the hearing and did not provide good reason why she failed to appear, he would dismiss her request for hearing without further notice, and the prior determination issued on November 8, 2004, would become the final determination of the Commissioner on her application. (Tr. 39). The ALJ issued an unfavorable decision dismissing her request for hearing and making the prior determination issued on November 8, 2004, the final determination of the Commissioner on her application. (Tr. ).

On December 18, 2007 in the Notice of Dismissal, the ALJ dismissed Claimant's request for a hearing finding that the request for review was not filed within the prescribed time limit. (Tr. 69-70). In the Order of Dismissal, the ALJ noted how on April 20, 2007, the case was remanded to the hearing office to take any action as needed to complete the record and issue a new decision. (Tr. 71). The ALJ noted how a Notice of Hearing advising Claimant of the time

and place of the hearing and requesting the completion of the Acknowledgment Form was mailed to the last known address for Claimant on September 7, 2007. The ALJ noted that Claimant did not return the Acknowledgment Form and the Notice of Hearing was not returned to the hearing office as undeliverable. (Tr. 71). After Claimant failed to appear at the hearing, a Notice to Show Cause for Failure ("Notice") to Appear was sent to Claimant by certified mail, and then returned by the post office annotated, "no such number; return to sender." (Tr. 72). After determining an incorrect street number had been used in the address for the Notice sent to Claimant, the hearings office resent another Notice, and then the Notice was returned as unclaimed. Based on the record, the ALJ found there to be no good cause for Claimant and the minor child's failure to appear at the time and place of the supplemental hearing scheduled on April 27, 2007. The ALJ ordered that the remand be abandoned and with the hearing decision vacated, the determination dated November 8, 2004, to be in effect. (Tr. 72).

On December 19, 2008, the Appeals Council entered a Notice of Affirmation and Order of Appeals Council Remanding Case to Administrative Law Judge. (Tr. 59-60). The Appeals Council found that Claimant filed a subsequent claim on May 29, 2009, alleging the date of disability to be May 29, 2008. (Tr. 61). The Appeals Council vacated the ALJ's Order of Dismissal and remanded the case for further proceedings on the issue of disability prior to May 29, 2008 after considering the evidence before the ALJ and the evidence submitted with the subsequent claim. (Tr. 61). In relevant part, the Appeals Council found that the acknowledgment card of the scheduled hearing of September 27, 2007 was not in Claimant's file and there is no evidence showing the hearing office attempted to contact Claimant for an explanation as to why the acknowledgment card was not returned. (Tr. 61-62). Further, the Appeals Council found

- 3 -

there was no evidence before the ALJ establishing that the notice of the hearing had been received by Claimant.  The Appeals Council cited in support Claimant's mother contention  that after the Appeals Council remanded the case to the ALJ, she was not notified that another hearing had scheduled, or that the ALJ has dismissed the request for hearing.  Further, Claimant's mother asserted that she had moved and had notified the Social Security Administration of her address change.  Based on the foregoing, the Appeals Council directed the ALJ to give Claimant another opportunity for a hearing and to take any further action needed to complete the administrative record and issue a new decision on the issue of disability prior to May 29, 2008.  (Tr. 62).

On February 18, 2009, the Office of Disability Adjudication and Review scheduled a supplemental hearing on March 30, 2009.  (Tr. 76-85).  On March 30, 2009, a hearing was held before an ALJ.  (Tr. 375-85).  Claimant testified and was represented by counsel.  (Id.).  Thereafter, on April 25, 2009, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 11-26).  On September 3, 2009, after considering the contentions raised by Claimant's counsel, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 6-9, 373-74).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on November 28, 2005

After questioning Alexis Scott, Claimant's mother, the ALJ determined that he did not have enough medical records to proceed with the hearing and requested Ms. Scott sign the four medical record releases.  (Tr. 388-95).  Ms. Scott testified that Claimant will need a shunt inserted and casting on her feet.  (Tr. 394).

### B. Hearing on March 30, 2009

#### 1. Claimant's Testimony

At the hearing on March 30, 2009, Claimant's biological mother, Alexis Scott, testified in response to questions posed by the ALJ and counsel. (Tr. 377-84). Ms. Scott testified that she has had custody of Claimant since her birth. (Tr. 377). Ms. Scott testified that Claimant was prematurely born. (Tr. 379). Complications from her birth included myelomeningocele and two surgeries. Claimant continues to receive medical treatment at Children's Hospital. (Tr. 380).

At the earlier hearing, Claimant did not have counsel. (Tr. 380). Ms. Scott testified that while the appeal was pending, she filed a new application on May 29, 2008, and the application was approved, and she has been receiving benefits for her daughter/Claimant. Ms. Scott testified that she is attempting to receive benefits that should have been paid on the initial application filed in October 2004. (Tr. 380). Ms. Scott testified that her daughter has the same medical condition as the one that resulted in daughter receiving disability payments pursuant to the new application. (Tr. 380-81). Ms. Scott testified that the medical condition that existed in 2004 is the same one she has and her daughter has the same complications as a result of the medical condition. (Tr. 381). Ms. Scott testified that her daughter is unable to be potty trained, because she does not have control of either her bladder or her bowel. The only other option is catheterization, but this is not an option until the daughter is between five and seven years old. Ms. Scott testified that Claimant has had this complication since birth. (Tr. 381). No doctor has been able to control the situation. (Tr. 382). The renal reroute surgery performed in September 2006 was to resolve Claimant's kidney reflux. (Tr. 382). The ALJ noted that the medical records indicate that Claimant's incontinence had been resolved since her surgery. Ms. Scott noted that the doctor on

February 12, 2009 found Claimant to have a functionally small capacity bladder and continued to experience incontinence. (Tr. 382-83). Claimant still wears a diaper, and Ms. Scott has to change her diaper every hour. (Tr. 383). Ms. Scott testified that Claimant has constant diaper rash. Claimant's counsel asserted that his position was that when he became involved and filed a new application, the Social Security accepted the position that Claimant met the requirements of listing 111.08B1. (Tr. 383). The attorney noted that he was not involved in the case until 2008, but the same condition existed then in 2004 as it exists at the time of the hearing. (Tr. 384).

### 2. Forms Completed by Claimant

In the Daily Activities Report (Child) completed by Claimant's mother, Ms. Scott, reported that Claimant has diaper rash due to frequent bowel movements and being monitored to determine whether she will need a shunt and whether she will need to be catheterized. (Tr. 101-04).

## III. Medical Records

On August 26, 2004, Dr. Allison Nash admitted Claimant to Cardinal Glennon Children's Hospital ("Cardinal Glennon") for treatment of respiratory distress, r/o sepsis, management of myelomeningocele, pain management, and hypotension. (Tr. 133-35). Dr. Ann Marie Flannery, a neurosurgeon, performed surgery to repair and closure of myelomeningocele (Tr. 138-40, 157). The x-ray of Claimant's chest showed a normal size heart and the presence of bilateral diffuse hazy infilitrates. (Tr. 154). The neurosonogram showed Claimant to have Chiari II malformation. (Tr. 188).

In the progress report of September 19, 2004, Dr. Delores Cox, a pediatric resident at Cardinal Glennon, found Claimant's respiratory distress, r/o sepsis, hypotension, and jaundice to

be resolved. (Tr. 145).

In the Discharge Summary dated October 1, 2004, Dr. Cox noted Claimant was born on August 25, 2004, at 29 weeks at St. Mary's Hospital and then transferred to Cardinal Glennon for respiratory distress, r/o sepsis, and management of myelomeningocele. (Tr. 131). Dr. Cox noted Claimant's problems to include pre-term infant, myelomeningocele, jaundice, breech presentation at birth, apnea, and hypotension. (Tr. 132). Dr. Cox assessed Claimant's condition at the time of discharge to be stable. (Tr. 132).

On October 19, 2004, a doctor with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide Newborn (2-3 Days) - 1 Month. (Tr. 168-69). In the Fine Motor/Gross Motor section, the examining doctor noted Claimant has equal movements, follows to midline, and lifts head while prone. (Tr. 169).

Claimant returned to Cardinal Glennon on October 28, 2004, for follow-up services. (Tr. 172-73). Dr. Anderson found Claimant's gross motor and fine motor skills to be normal. (Tr. 173).

In the Childhood Disability Evaluation Form completed on November 8, 2004, by Mehta Nalini, the consultant, listed MDI prematurity and myelomeningocele (repaired) as Claimant's impairments. (Tr. 175). The consultant determined that Claimant's impairment or combination of impairments to be severe but not meet, medically, equal, or functionally equal the listings. (Tr. 175). Dr. Nalini found Claimant to have less than marked limitations with respect to movement and manipulation of objects. (Tr. 178). Dr. Nalini found Claimant to have marked limitations with respect to health and physical well being. In support, the consultant noted that after her birth on August 25, 2004, Claimant stayed in the hospital until October 1, 2004. During the

hospitalization, Claimant's respiratory distress resolved, her jaundice resolved, and she had surgery to close her myelomeningocele and physical therapy. Claimant's discharge diagnosis included prematurity repaired myelomeningocele, breech presentation at birth, apnea and bradycardia. Claimant's follow-up examination with Dr. Nash on October 19, 2004, and her nursery follow-up visit were both found to be normal. (Tr. 178). The consultant opined that Claimant was born premature with some impairments, some of which have resolved. (Tr. 180). The consultant found Claimant's impairments to be marked but she does not meet, equal or functionally equate a listing. (Tr. 180).

On January 19, 2005, a doctor with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide 2-3 Months. (Tr. 229-30). In the assessment, the doctor recommended that Claimant receive follow-up treatment with neurology. (Tr. 230).

Dr. Bradley Davitt, an ophthalmologist, examined Claimant on February 16, 2005. (Tr. 194). Examination showed Claimant's fixation to be good in each eye and penlight examination of the anterior segments all unremarkable. Dr. Davitt opined that Claimant is a "5-month-old former preemie who now has a normal exam for age." (Tr. 194).

On March 3, 2005, Dr. Connie Anderson, a neonatologist, performed a developmental evaluation. (Tr. 189). Claimant's parents reported Claimant to be doing well at home and having no specific concerns about her development. Dr. Anderson noted that Claimant's parents have missed frequent visits for both the developmental follow-up clinic and for the myelomeningocele clinic. Claimant's mother reported First Steps visiting at home, but she felt like the services were not needed and did not want First Steps coming to her house. Examination showed Claimant to

be awake, alert, and interactive. Dr. Anderson reported Claimant to smile when addressed and to have muscle impairment because of her myelomeningocele. (Tr. 189). Dr. Anderson assessed Claimant's development at a gross motor of 3 months and a fine motor age of 3.5 months resulting in her being delayed in comparison to her adjusted development of 4.75. (Tr. 189-90, 192). Dr. Anderson noted Claimant's weight to be less than the tenth percentile. (Tr. 190). Dr. Anderson opined that Claimant is showing some concerning signs for failure to thrive and developmental delay and recommended her mother to reconnect with First Steps given the developmental needs of her daughter. (Tr. 190-91). Physical examination showed Claimant's musculoskeletal to be normal. (Tr. 192). In the Nursery Follow-Up Services Physical Therapy, the physical therapist recommended reaching/grasping activities, rolling activities, sitting and rolling, and First Steps intervention. (Tr. 193). The therapist noted that Claimant's mother not in agreement about First Steps. (Tr. 193).

On April 6, 2005, a doctor with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide 6-8 Months. (Tr. 226-27). In the assessment, the doctor noted Claimant to be a well baby. (Tr. 227).

The renal sonogram of May 2, 2005, revealed normal sonogram of Claimant's kidneys. (Tr. 215). The VCUG showed bilateral grade 2 vesicoureteral reflux and spinal dysraphism. (Tr. 216).

On May 19, 2005, Dr. Paul Austin, a pediatric urologist, evaluated Claimant. (Tr. 214). Examination showed a healthy- appearing nine-month-old female in no apparent distress. Dr. Austin noted that Claimant has myelodysplasia, and she will have to have baseline evaluations to assess her bladder pressures and to obtain VCUG. (Tr. 214). The MRI of Claimant's head

showed moderate dilatation of the third and lateral ventricles without a significant increase in the fourth ventricle and mild thinning of the corpus callosum. (tr. 316). In a New Patient Visit, Dr. Eric Gordon, an orthopaedic surgeon, evaluated Claimant for her foot deformities. (Tr. 202). Examination showed Claimant's feet held in a dorsiflexed position with fairly nice flexibility. Dr. Gordon diagnosed Claimant with myelodsyplasia probably of an L5 level with a calcaneus foot deformity. Dr. Gordon recommended physical therapy as treatment and started Claimant on a stretching program and fitted her with some night splints to plantar flex her feet. (Tr. 202). In a letter, Dr. Austin apprised Dr. Nash of his examination and course of treatment. (Tr. 288, 320). Claimant started physical therapy to help with Claimant's developmental delays. (Tr. 301-03).

On June 2, 2005, Dr. Austin treated Claimant for bladder management and found Claimant's bladder compliance to be safe and low leak pressure with open bladder neck. (Tr. 212). Dr. Austin noted that Claimant's examination to be essentially unchanged from her last office visit and found Claimant to have a bilateral low-grade vesicoureteral reflux and placed her on Bactrim urinary prophylaxis. (Tr. 211). The renal sonogram showed normal kidneys. (Tr. 262, 315). The VCUG limited revealed Claimant has bilateral grade 2 vesicoureteral reflux and spinal dysraphism. (Tr. 272). The videocystometrogram and EMG showed Claimant's bladder compliance to be safe, low leak point pressure with open bladder neck, and literal Grade 2 VUR. (Tr. 294, 322). The cystouretrhography voiding showed bilateral grade 2 vesicoureteral reflux and spinal dysraphism. (Tr. 314). In a letter dated November 2, 2005, Dr. Austin updated Claimant's progress. (Tr. 287, 321). Dr. Austin noted that Claimant's exam to be unchanged from her last visit and diagnosed Claimant with bilateral low-grade vesicoureteral reflux and placed Claimant on Bactrim urinary prophylaxis. (Tr. 287, 321).

On June 6, 2005, a nurse with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide 9-11 Months. (Tr. 224-25). The nurse found Claimant's gross motor and fine motor skills to be normal. (Tr. 225).

On July 7, 2005, Claimant received follow-up services with Dr. Nash at Cardinal Glennon for prematurity, spina bifida, Chiari II malformation, delayed milestones, and growth failure. (Tr. 185-86).

On September 10, 2005, Claimant's mother reported that she had a rash from medications. (Tr. 259). Dr. Nash diagnosed Claimant with a harmless and non-allergic amoxicillin rash. (Tr. 259). Dr. Nash ordered Claimant to stop taking amoxicillin and ordered another prescription. (Tr. 260).

The September 29, 2005 MRI of Claimant's head showed slight interval enlargement in the moderately dilated lateral ventricles and unchanged thinning of the corpus callosum. (Tr. 250, 313). Dr. Jeffrey Leonard, a neurosurgeon at St. Louis Children's Hospital, evaluated Claimant myelomeningocele. (Tr. 252, 339). Dr. Leonard noted that Claimant had her myelomeningocele repaired the day after birth. The MRI of her brain in April 2005 showed some very mild ventriculomegaly as well as colpocephaly. Dr. Leonard noted that Claimant has been doing well and has been asymptomatic and tolerating diet well and meeting her neurologic milestones. Dr. Leonard diagnosed Claimant with myelomeningocele with MRI evidence of hydrocephalus. (Tr. 252,339). Dr. Leonard opined that Claimant is likely in need of ventriculopertioneal shunt, but in light of Claimant's good clinical examination and lack of symptoms of hydrocephalus, Dr. Leonard decided to have a repeat scan in two months after discussing options with Claimant's parents. (Tr. 252-53,339-40). Physical examination showed good strength of Claimant's upper

extremities and the ability to bear weight on her lower extremities. (Tr. 252, 339). Dr. Leonard opined that if the MRI in two months shows interval increase in ventricular size, he would absolutely recommend placement of a VP shunt. (Tr. 253).

On October 24, 2005, a doctor with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide 12-14 Months. (Tr. 221-22). The doctor referred Claimant to First Steps. (Tr. 222).

On November 4, 2005, Claimant returned for follow-up treatment by Dr. Gordon. (Tr. 199). Dr. Gordon noted Claimant to be doing well and already starting to cruise. Examination showed excellent abduction of her hips and easily active plantarflexion on the right side of her foot and no bilateral foot deformities. Dr. Gordon found Claimant has a sacral level myelodysplasia and to be doing extremely well. Dr. Gordon recommended physical therapy as his treatment plan. (Tr. 199).On referral by Dr. Gordon, Claimant received physical therapy screening. (Tr. 204). The physical therapist noted that Claimant's family is aware of need for interventionist to monitor gross motor skills and development. The therapist noted that Claimant has problems with mild motor delays and determined Claimant would benefit from physical therapy to address the problems with exercise and education. The therapist provided an exercise sheet reviewing developmental activities for strengthening and printed available First Steps provider close to parents. (Tr. 204). The pelvic x-ray revealed seated hips. (Tr. 249).

On November 10, 2005, Claimant returned for a  follow-up visit of large ventricles and myelmeningocele. (Tr. 251, 341). Dr. Leonard noted her MRI from April 2005 showed mild ventriculomegaly and found her otherwise to be doing well and asymptomatic. Dr. Leonard noted that Claimant has been meeting her neurologic milestones. Claimant returned for a repeat MRI

and measurement of head circumference. (Tr. 251, 341). The November 10, 2005 MRI of Claimant's brain showed enlarged ventricles and no significant change of periventricular size since last examination. (Tr. 248, 312). Neurological examination showed Claimant to be awake, alert, and her gaze to be conjugate. (Tr. 251). After reviewing the MRI, Dr. Leonard found Claimant to have enlarged ventricles with no significant change from the previous examination. Dr. Leonard determined to have Claimant return in six months for follow up and measurement of OFC. (Tr. 251).

On March 16, 2006, a nurse with the Missouri Department of Social Services completed a Healthy Children and Youth Screening Guide 15-17 Months. (Tr. 257-58, 349-50). The nurse found Claimant's gross motor and fine motor skills to be normal. (Tr. 257-58, 349-50).

On May 19, 2006, Claimant's mother called Dr. Nash's office and reported Claimant running a fever and having asthma. (Tr. 256, 351). Dr. Nash prescribed albuterol. (Tr. 256, 351).

In a follow-up visit on June 8, 2006, Dr. Leonard opined that Claimant no longer needs neurosurgical treatment inasmuch as Claimant continued to do well and follow the normal growth and developmental milestones since her last visit and determined Claimant should return in six months after repeating a MRI scan.. (Tr. 254, 342). Physical examination showed good strength in all four of Claimant's extremities, the ability to bear weight and to take a couple of steps. Neurological examination showed Claimant's balance, gait, and station to be appropriate for her age, and Claimant to be awake and alert and to have good muscle bulk, tone and strength in all four extremities. Claimant's mother reported that she is able to do similar physical activities as her twin sister. (Tr. 254, 342).

The June 8, 2006, renal sonogram showed Claimant's kidneys to be borderline small. (Tr. 246, 309). The cystourethrography for voiding showed bilateral grade II vesicoureteral reflux, ectopic insertion of the right ureter into the very distal urethra with no evidence of duplication, and spinal dysraphism. (Tr. 247, 308). The cystometrogram and EMG showed Claimant's bladder compliance to be safe and a small functional capacity bladder. (Tr. 292, 325). In a letter dated June 8, 2006, Dr. Austin updated Claimant's progress. (Tr. 286, 324). Dr. Austin noted that Claimant has neurogenic bladder secondary to myelodysplasia, and she returned for a VCUG and a urodynamics. The VCUG showed an ectopic insertion of her right ureter near her introitus with persistent Grade II reflux. Dr. Austin discussed performing a ureteral reimplantation to be scheduled on September 13, 2006. (Tr. 286, 324).

On July 12, 2006, the doctor prescribed a topical cream as treatment for Claimant's diaper rash. (Tr. 352).

In a letter dated August 24, 2006, Dr. Austin updated Claimant's progress. (Tr. 283, 327, 353). Dr. Austin noted Claimant's history of reflux and ectopic ureter and how Claimant is scheduled for surgery in a few weeks. (Tr. 283, 327). The pelvic radiography showed Claimant's hips to be seated bilaterally. (Tr. 311).

On August 28, 2006, Claimant returned to Dr. Nash's office for a well child visit for age two. (Tr. 270, 354). Dr. Nash listed helping in house, removing garments, using spoon, fork, pointing to two pictures, using pronouns, using two word phrases, toilet training, two step commands, telling first and last name, and asking for specific foods as emerging developmental milestones. (Tr. 271, 355). Claimant's father reported no ongoing diaper rash problems. (Tr. 271, 355).

In the September 13, 2006 Operative Summary, Dr. Austin listed bilateral vesicoureteral reflux, ectopic right ureter, and spina bifida as Claimant's preoperative diagnosis. (Tr. 240). Dr. Austin performed right ureteral reimplantation, cystoscopy with urethral dilatation and calibration, open right retrograde ureteropyelogram, and vaginoscopy. (Tr. 240, 296-300, 329-30). The abdominal radiography showed urethral duplication. (Tr. 243). In a letter, Dr. Austin apprised Dr. Nash of Claimant's surgery and how during the operation, he discovered that Claimant has an orthotopic refluxing right ureter as well as urethral duplication. (Tr. 289, 328, 356). Dr. Austin noted how he performed ureteral implantation and urethral dilatation secondary to a urethral meatus due to double urethra. (Tr. 289, 328, 356). The abdominal radiography showed urethral duplication. (Tr. 307).

The November 3, 2006, x-ray of Claimant's pelvis showed a grossly normal evaluation of her pelvis. (Tr. 235, 306).

The renal sonography performed on November 9, 2006, showed normal kidneys. (Tr. 234). The renal sonography showed normal kidneys and little urine within the urinary bladder. (Tr. 305).

In a letter dated November 9, 2006, Dr. Austin updated Claimant's progress. (Tr. 280, 331, 358). On September 13, 2006, Dr. Austin performed a right Leadbetter-Politano reimplantation. In a follow-up visit, Claimant reported no complaints. Dr. Austin noted that an ultrasound showed normal appearing kidneys and no evidence of hydronephrosis. In summary, Dr. Austin found Claimant to be doing well from her surgery and noted he would like to obtain the VCUG to determine if the reflux had been resolved since surgery. (Tr. 280, 331, 358).

The cystourethrography for voiding performed on May 17, 2007, showed no

vesicoureteral reflux and no urethral abnormalities. (Tr. 232). The cystometrogram and EMG showed Claimant's bladder compliance to be marginal with elevated leak point pressure. (Tr. 290).

In a letter dated May 17, 2007, Dr. Austin apprised Dr. Nash of Claimant undergoing a Leadbetter-Politano reimplantation of her right ureter on September 13, 2006 and a neurogenic bladder secondary to mild dysplasia. (Tr. 277, 332, 361). Dr. Austin opined that Claimant manages her bladder with spontaneous diaper voiding. Dr. Austin noted that the VCUG showed no evidence of reflux. Dr. Austin indicated that he would like to repeat her urodynamics in six months because of the marginal leak point pressure, and her reflux has been resolved since her surgery. (Tr. 277, 332, 361). The cystourethrography voiding showed no vesicoureteral reflux or urethral abnormalities. (Tr. 304, 362). The cystometrogram and EMG showed Claimant's bladder compliance to be marginal with elevated leak point pressure. (Tr. 333).

On October 30, 2007, Claimant returned to Dr. Nash's office for a well child visit for age three. (Tr. 265, 363). Dr. Nash noted Claimant to have normal activity of a child her age and good peer involvement. (Tr. 265, 363). Claimant still wears a diaper because of sacral meningomyelocele and neurogenic bladder. (Tr. 266, 364). Dr. Nash noted that Claimant has not met the milestones for fine motor/gross motor, kicking ball forward, jumping in place, balancing on one foot three to five seconds, copying circle, drawing a person with three parts, and riding a tricycle and has met the milestones for stacking six cubes, throwing a ball overhead, and dressing without help. (Tr. 266-67, 364-65). Dr. Nash found that Claimant has met the three year developmental milestones for naming four pictures, putting on clothes, brushing teeth without assistance, speech mostly understandable, awareness of gender, three word sentences and has not

met naming age and sex, and discussing activities. (Tr. 267, 365). Under diagnoses, Dr. Nash found that Claimant's spina bifida causes Claimant's neurogenic bladder, but Claimant is able to walk well and her hips appear to be seated. (Tr. 267, 365).

In the Teacher Questionnaire completed on July 2, 2008 by Alice Ratnaswamy, the teacher director at A2Z Learning Center, noted that she has known Claimant for ten months and sees her five days a week, nine hours a day. (Tr. 120-27). Ms. Ratnaswamy opined that Claimant has obvious problems in comprehending and/or following oral instructions and slight problems in recalling and applying previously-learned material, applying problem-solving skills in class discussions, and no problems in understanding school and content vocabulary. (Tr. 121). Ms. Ratnaswamy noted that some of Claimant's problems do not apply to her age group. (Tr. 121). In attending and completing tasks, Ms. Ratnaswamy noted Claimant has obvious problems in paying attention when spoken to directly, and carrying out multi-step instructions on a daily basis. (Tr. 122). Ms. Ratnaswamy further noted Claimant has a slight problem in sustaining attention, focusing long enough to finish assigned activities or tasks when necessary, carrying out single-step instructions and waiting to take turns. Ms. Ratnaswamy opined that some of the behavior Claimant's displays may be slight autism. (Tr. 122). Ms. Ratnaswamy found Claimant in interacting and relating with others has obvious problems with seeking attention appropriately on a daily basis. (Tr. 123). Ms. Ratnaswamy noted that Claimant's speech may not be on level with her age and one-third to one-half of her speech could not be understood on the first attempt. (Tr. 123-24). In moving and manipulating objects, Ms. Ratnaswamy noted that Claimant has serious problems in moving her body from one place to another, and in dexterity in activities or tasks, in planning, remembering, and executing controlled motor movements. (Tr. 124). In additional

comments, Ms. Ratnaswamy noted that Claimant constantly had severe diaper rash due to her inability to communicate her need to void. (Tr. 127). In the Speech/ Language Pathologist Questionnaire, Ms. Ratnaswamy indicated that Claimant was not talking and her speech was intelligible on the first attempt almost half of the time. (Tr. 128).

The February 12, 2009, renal ultrasound revealed renal cortical echogenicity to be normal and no hydronephrosis. (Tr. 335). Claimant returned for evaluation by Dr. Austin. (Tr. 336). Dr. Austin noted that Claimant has a functionally small capacity bladder. (Tr. 336, 367). Dr. Austin opined that Claimant has a normal RBUS, and noted he would continue to observe with diaper voiding and allow for maturation. (Tr. 337, 368). Previous studies showed Claimant to have a small bladder functionally, and he anticipated that she will likely require anticholinergics and CIC to attain social continence. (Tr. 337, 368). The MRI of Claimant's brain showed Chiari II malformation, posterior parietal and occipital white matter volume loss likely the sequela of in utero ischemic insult, and no significant interval change since November 10, 2005. (Tr. 345).

In a follow-up visit on February 26, 2009, Dr. Leonard evaluated Claimant's progress after a myelomeningocele four years earlier. (Tr. 346). Dr. Leonard noted that Claimant has been doing well since then citing how Claimant is ambulatory. Dr. Leonard noted that Claimant is somewhat incontinent and being followed by a urologist. Although her mother reported that Claimant is progressing well, her mother thinks she is slightly delayed compared to her sister citing her inability to color as well as her sister. Dr. Leonard observed Claimant's gait to be normal. Dr. Leonard noted that Claimant has neurogenic bladder and is being followed by a urologist. (Tr. 346).

On March 12, 2009, Claimant returned to Dr. Nash's office for a well child visit for age

five.  (Tr. 369).  Dr. Nash noted Claimant has chronic diaper rash due to incontinence well controlled at the present time.  (Tr. 369).  Dr. Nash noted Claimant has urine incontinence due to spina bifida.  (Tr. 370).  In the Child Development/Guidance, Dr. Nash found Claimant to have minimal skills emerging in counting one block, putting on t-shirts, using two objects, washing and drying hands, naming one color, name, age, and sex, and discussing activities.  (Tr. 371).  Dr. Nash found Claimant to have met the milestones for wiggling thumbs, balancing on each foot for two seconds, stacking eight cubes, and broad jumping and to be emerging skills in riding tricycles, dressing without help, copying circles, drawing a person with three parts, balancing on one foot for three to five seconds, jumping in place, stacking ten blocks, and picking longer line.  (Tr. 371).

## IV.    The ALJ's Decision

The ALJ noted that the Appeals Council ordered the ALJ to take any further action needed to complete the record and issue a new decision on the issue of disability prior to May 29, 2008.  (Tr. 14).  The ALJ noted that Claimant's birth date to be August 25, 2004.  (Tr. 17).  The ALJ found that Claimant has not engaged in substantial gainful activity at any time relevant to the decision.  The ALJ found that the medical evidence establishes that Claimant has a history of spina bifida with hydrocephalus.  The ALJ determined that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments set forth Appendix 1, Subpart P, Regulations No. 4.  (Tr. 17).  The ALJ determined that Claimant does not have an impairment or combination of impairments that functionally equals the listings.  (Tr. 18-25).  In support, the ALJ noted how the medical treatment records repeatedly documented Claimant doing well with asymptomatic hydrocephalus and without any significant motor delays.

(Tr. 25). The ALJ found that the medical treatment records of Drs. Gordon, Shaw, Austin, Nash, and Leonard from early 2005 through 2009 showed little more than a neurogenic bladder resulting from spina bifida repair not resulting in significant limitations of function in any domain including gross and fine motor functioning. (Tr. 25-26). The records showed Claimant to be developing normally with respect to strength, coordination, and motion and without significant deficits in coordination, strength, gait, station, balance, motion, and tone. (Tr. 26). The ALJ thus concluded that Claimant was not disabled during the period from the alleged onset date of August 25, 2004 through at least May 28, 2008. (Tr. 25).

## V. Discussion

20 C.F.R. § 416.906 (2000) provides the definition for disability in children. That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924 (2000). The ALJ first determines whether a plaintiff is doing substantial gainful activity. If so, the plaintiff is not disabled. 20 C.F.R. § 416.924(b). If not, the ALJ considers a plaintiff's physical or mental impairment to determine whether the plaintiff has a medically determinable impairment(s) that is severe. 20 C.F.R. 416.924(c). If the impairment(s) is not medically determinable or is a slight abnormality that causes minimal limitations, the ALJ will find that the plaintiff does not have a severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment(s) is severe, at step three the ALJ compares the impairment to the

childhood listings in Appendix 1. If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled. 20 C.F.R. § 416. 924; Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

A child's impairment functionally equals a listed impairment if there is an "extreme" limitation in one of the six functional domains, or a "marked" limitation in at least two of the domains. 20 C.F.R. § 416.926a(b)(1); Hudson ex. rel Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003). The ALJ considers how a plaintiff functions in activities in the following six domains: "(I) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating to others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well being." 20 C.F.R. § 416.926a(e)(2). A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities; an extreme limitation is one that "interferes very seriously" with these abilities. 20 C.F.R. § 416.9262(e)(2), (3). Not every activity in a domain must be markedly or extremely limited in order for the child's functioning in the domain as a whole to be considered so. Id.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly consider the listing of impairments. Claimant further contends that the ALJ failed to properly consider functional equivalence.

A.           Listings 101.04 and 111.08

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly consider the listing of impairments.

According to the listing for disorders of the spine, Listing 101.04, for a claimant to be presumed to be disabled from such a disorder, she must provide evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness and muscle weakness) accompanied by sensory or reflux loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

In order for a claimant to show that her impairment matches a listing, the impairment must

meet all specified medical criteria.  <u>Deckard v. Apfel</u>, 213 F.3d 996, 997 (8th Cir. 2000).  The claimant has the burden of showing that she met a listing.  <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006); <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).  In the instant case, the evidence supports the ALJ determination that at step two that Claimant's physical impairments do not meet or equal a listed impairment.  The specific references to the medical records showing bladder and bowel incontinence do not show the existence of the requirements to meet Listing 101.04.  Listing 101.04 does not provide for disability based upon incontinence.

To the contrary, there is substantial evidence in the record supporting the ALJ's determination, and the ALJ discussed many of the factors required under Listing 101.04.  Specifically, the ALJ noted that Claimant had no persistent limitation of motor, sensory or reflex functioning in her extremities.  Although Claimant was born prematurely and exhibited some motor delays, her motor functioning was generally found to be normal.  In October 2004, Claimant's motor functioning was normal.  In March 2005, Claimant's gross motor skills were normal and her fine motor skills were somewhat delayed and her musculoskeletal examination was otherwise normal.  In the examination of September 2005,  Dr. Leonard noted that Claimant had her myelomeningocele repaired the day after birth and has been meeting her neurologic milestones.  Physical examination showed good strength of Claimant's upper extremities and the ability to bear weight on her lower extremities. On November 10, 2005, Dr. Leonard noted that Claimant to be meeting neurologic milestones, playful and active, and attempting to walk.  Musculoskeletal examination showed good strength in her upper extremities and the ability to bear weight on her lower extremities.  In June 2006, Dr. Leonard opined that Claimant did not need neurosurgical treatment inasmuch as she continued to do well and follow the normal growth

and development milestones since her last visit. Neurological examination showed Claimant's balance, gait, and station to be appropriate for her age and Claimant to be awake and alert and to have good muscle bulk, tone and strength in all four extremities. In October 2007, Dr. Nash noted Claimant to have normal activity of a child her age and good peer involvement and still wearing a diaper due to her neurogenic bladder, her only remaining symptom of spina bifida. Dr. Nash noted that Claimant is able to walk well and her hips appear to be seated. (Tr. 267, 365). Substantial evidence supports a finding that Claimant failed to meed the specified medical criteria for Listing 101.04.

Likewise, Claimant's contention regarding Listing 111.08 is without merit inasmuch as the medical records establish that her motor function to be normal. (Tr. 169, 173, 189-90, 192, 224, 252, 254, 257-58, 266-67, 339, 342, 349-50, 364-65). In order to be disabled under this listing, Claimant must establish age inappropriate incontinence accompanied by more than slight motor dysfunction. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 111.08. Substantial evidence supports a finding that Claimant's motor function was not more than slight. Accordingly, Claimant cannot meet all the specified medical criteria of Listing 111.08.

In sum, a review of the record convinces the Court that the ALJ's decision was "within the available zone of choice" and should not be disturbed. Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).

B.          Functional Equivalence

Claimant further contends that the ALJ failed to properly consider functional equivalence. Claimant argues that she has "marked" limitations in the domain of moving and manipulating and

health and physical well being. A finding of functional equivalence will be made when a child has an "extreme" limitation in one domain of functioning or "marked" limitations in at least two domains. See 20 C.F.R. § 416.926a(e).

In the present case, the ALJ determined that Claimant's impairments were not of a severity that met or medically equaled the severity of any listed impairment. The ALJ then evaluated functional equivalence and determined that none of Claimant's conditions "resulted in severe limitations of function upon the claimant's age appropriate functioning, for twelve months in duration. The record does not document that the leaking of urine and use of a diaper significantly hampered the claimant as a two year old at that time." (Tr. 18-25). The medical records from June 2005, September 2005, November 2005, March 2006, and June 2006 are devoid of any reporting of diaper rash. (Tr. 251-52, 339, 432, 349). Although the treatment record of July 2006 shows the treating doctor prescribed a topical cream as treatment for Claimant's diaper rash, at her two-year check up on August 28, 2006, Claimant's father did not report on ongoing problem with diaper rash. (Tr. 271, 352). At her three-year check up on October 30, 2007, diaper rash was not listed as a concern. (Tr. 265-67). In support, the ALJ cited how Claimant's parents reported Claimant to be doing well at home and that they had no specific concerns about her development. (Tr. 20). The ALJ noted how "the medical treatment records do not document more than very infrequent complaints of diaper rash during the period since the alleged onset date. The medical treatment records do not document ongoing findings, by a treating physician, that the claimant's diaper rash results in severe limitations of function, for twelve months in duration." The ALJ found that on March 12, 2009, Claimant's diaper rash was well controlled. Accordingly, the ALJ determined that the objective medical evidence to be

inconsistent with allegations of severe limitations of function in the domain of health and physical well being.

Similarly, the ALJ opined that the medical evidence does not support a finding of marked limitation in the domain of moving and manipulating. In support, the ALJ cited the November 8, 2004, the Childhood Disability Evaluation Form, in which the evaluating doctor found Claimant to have less than marked limitations with respect to movement and manipulation of objects. The ALJ further found that the medical treatment records do not document findings "by treating physicians, that the claimant's vesicoureteral reflux, or other related conditions, resulted in severe limitations of function upon the claimant's age appropriate functioning, for twelve months in duration." (Tr. 19). Further, the ALJ noted how Claimant's parents reporting on March 3, 2005,Claimant to be doing well at home and having no specific concerns about her development. to be inconsistent with allegations of extreme or even marked limitations of function. (Tr. 20).

Indeed, during the assessment Dr. Anderson noted that Claimant's parents missed frequent visits for both the developmental follow-up clinic and for the myelomeningocele clinic, and Claimant's mother not wanting or needing First Steps coming to her house. On that same day, a physical therapist recommended reaching/grasping activities, rolling activities, sitting and rolling, and First Steps intervention. The ALJ noted how in May 2005, the physical therapist observed Claimant to be cruising around furniture and attempting to stand by herself and reporting Claimant having only mild motor delays. Dr. Gordon found Claimant to be doing well and already starting to cruise. (Tr. 20). The ALJ noted how on September 29, 2005, Dr. Gordon reported Claimant to be doing well and asymptomatic and meeting her neurologic milestones. (Tr. 21). Further, on June 8, 2006, Dr. Leonard found Claimant continued to do well and reached

development milestones and noted Claimant's balance, gait, and station to be appropriate for her age and Claimant to be awake and alert and to have good muscle bulk, tone and strength in all four extremities. The ALJ cited how Dr. Nash' medical treatment notes showed Claimant walking well and her only problem to be a neurogenic bladder. The ALJ noted how the medical treatment notes showed Claimant to have normal and/or appropriate milestone development, strength, gait, station, and balance. (Tr. 21). The ALJ opined that the medicals records were inconsistent with allegedly disabling symptoms and limitations of function lasting twelve months in duration and in fact showed Claimant to be developing normally with respect to strength, coordination, and motion and meeting appropriate milestones. (Tr. 22-23). The ALJ appropriately articulated the inconsistencies upon which he relied in discrediting the testimony of disabling impairments, and because substantial evidence in the record supports this finding, this Court should affirm the ALJ's finding. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). Accordingly, the ALJ determined that the objective medical evidence to be inconsistent with allegations of severe limitations of function in the domain of movement and manipulation.

Claimant's contention that the ALJ improperly rejected the opinion of Ms. Ratnaswamy when evaluating her level of functioning is without merit. Ms. Ratnaswamy was a non-medical source.[2] "[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20

[2]In relevant part, the ALJ noted:
The record includes a teacher questionnaire, of the same date, in which the same responder reported the claimant exhibited only one or two obvious problems in each of the areas of acquisition and use of information, attention and task completion, and interaction with, and relating to, others. The claimant was reported with only three obvious problems in the areas of self-care. The claimant was otherwise reported with no or only slight problems in these areas or

- 27 -

C.F.R. § 404.1502; 416.902, whose medical opinions may be entitled to controlling weight." Social Security Ruling 06-03p.[3] Even if Ms. Ratnaswamy were considered an "other source," the ALJ is not bound by her opinion and the ALJ has more discretion in regard to the weight to be given her opinion. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). "Other sources" cannot be relied upon to establish the existence of a medically determinable impairment, but may provide evidence to show the severity of impairments and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Further, Ms. Ratnaswamy's opinion was contrary to the evidence of record, including the findings of Clamant's treating and examining doctors. No other medical source determined Claimant to have serious problems moving about, demonstrating strength and coordination, and executing controlled movements. Similarly, the behavioral problems noted by Ms. Ratnaswamy were not corroborated by any other medical source. The undersigned agrees. As such, the Court finds that the ALJ gave proper weight to the opinion of Ms. Ratnaswamy and that the ALJ's decision in this regard is supported by substantial evidence.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

_____

domains. The claimant's speech was reported understandable after repetition or rephrasing. The responder reported the claimant did not require behavior modification strategies. She was noted to use special education services. Although, the record does not document the responder with a teaching certificate/degree, her observations are considered by this Administrative Law Judge, as those of a lay person. Her reported observations are not consistent with findings of extreme, marked or even moderate limitations in these domains. They indicate, at most, no or only slight limitations in the above areas of function.
(Tr. 24).

[3]Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and how may have "valuable sources of evidence for assessing impairment severity and functioning." SSR 06-03p, 2006 WL 2329939, *3 (S.S.A. 2206). Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." Id.

record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this

Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case

differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the

ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of

the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  30th  day of March, 2011.